

1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES,                                    )
                                                 )
            Plaintiff,                           )        2:08-cr-00283-RCJ-RJJ
                                                 )
vs.                                              )
                                                 )        **O R D E R**
REGINALD DUNLAP *et al.*,                        )
                                                 )
            Defendants.                          )
_____            )

13       This matter came before the Court for a hearing on the Government's Motion For the
14   Appointment of a Conflicts Attorney for Defendant Reginald Dunlap (#139).  The Court has
15   considered the Government's Motion (#139) and Supplement (#165); Defendant Reginald Dunlap's
16   Response (#153); and the testimony and arguments presented at the hearing on this matter.

17                  **BACKGROUND**

18       On October 28, 2008, a federal grand jury returned a multiple-count, multiple-defendant
19   Indictment.  The Indictment charges that the various defendants are members of the "Playboy
20   Bloods," a RICO enterprise engaged in a "pattern of racketeering activity."  *See* 18 U.S.C. §
21   1961(4), (5).  Defendant Reginald Dunlap is charged with conspiring to engage in a "pattern of
22   racketeering activity" in violation of 18 U.S.C. § 1962(d).  He is also charged with violating 18
23   U.S.C. § 1959(a)(1) and (a)(2) by committing a violent crime, specifically murder, in aid of
24   racketeering activity.  It is also alleged that he violated 18 U.S.C. §§ 924(c)(1), 924 (j)(1), and
25   924(j)(2) by using a firearm during the commission of the alleged murder.[1]  The charges carry a
26   potential capital sentence.  He has pled not guilty to all charges.

27       On November 7, 2008, the court entered an order appointing Daniel Albregts to represent

28

_____

[1] Dunlap is also charged with violating 21 U.S.C. § 846 (conspiring to engage in drug trafficking) and 18 U.S.C. § 2 (aiding and abetting).

1   Dunlap.  On January 7, 2009, Dunlap, with all other capitally charged defendants, filed a motion

2   seeking appointment of learned counsel pursuant to 18 U.S.C. § 3005.  (#114).  The court

3   granted the request and appointed William D. Matthewman, Esq. "learned counsel" for Dunlap.

4   Subsquently, the Government filed this motion requesting  that Albregts be disqualified due to a

5   conflict of interest arising out of his prior representation of a key government witness (hereinafter

6   "Witness A").  (#139).  The motion was accompanied by a request for a hearing and suggested

7   procedures for the hearing.  (#141).

8   **1.  The Government's Motion to Disqualify and Appoint Conflict Free Counsel**

9          The Government's motion is straightforward.  Albregts represented Witness A during the

10  grand jury investigation of Dunlap and the other defendants in this case.  Witness A testified

11  before the grand jury.  Witness A, an unindicted co-conspirator, will be called upon to testify at

12  trial.  As such, Albregts will be faced with the difficult task of examining his former client,

13  Witness A, for the benefit of his current client, Dunlap.  The Government argues that Albregts'

14  competing duties create an impossible ethical dilemma –zealously representing Dunlap while

15  effectively cross-examining Witness A without violating his ethical obligations to either.  The

16  Government further argues that the potential conflict is so great that any waiver by Dunlap

17  should be rejected.

18         Albregts represented Witness A.  He met with Witness A on multiple occasions during

19  the grand jury investigation and discussed Witness A's status in the investigation, grand jury

20  procedure, alternatives regarding cooperation with the government, and testimony before the

21  grand jury.  Albregts fostered the "attorney-client relationship and answered extensive questions

22  regarding whether [Witness A] should cooperate with the government."  Def's Opposition

23  (#153).  He was present during a meeting with the prosecution where there were "extensive

24  discussions regarding Witness A's testimony, the grand jury procedure, and federal court."  *Id*.

25  He also appeared with Witness A at a meeting with case agents where there was extensive

26  discussion regarding (1) Witness A's proposed grand jury testimony and (2) Witness A's

27  involvement and knowledge of the underlying investigation.  After being notified that the case

28  was ready to be presented to the grand jury and that Witness A's testimony would be needed,

Albregts met again with Witness A to discuss the process, testimony, options, and importance of Witness A's cooperation with the government.  Albregts appeared with Witness A at the grand jury room and conferred with the prosecution prior to Witness A's grand jury testimony.  Upon completion of the testimony, Albregts informed Witness A that his representation was complete.

After the grand jury returned the Indictment, Albregts was appointed to represent Dunlap. On November 19, 2008, Albregts had an extensive meeting with Dunlap.  Albregts immediately suspected that he may have represented Witness A during the underlying investigation leading to Dunlap's indictment.  Consequently, Albregts reviewed his files and determined that Witness A was involved in the investigation of this case.  Albregts consulted the relevant rules and other attorneys regarding the situation.  Ultimately, he determined that the circumstances did not merit his withdrawal because:

(1)  Witness A had not given him information about Dunlap;

(2)  His representation of Witness A had been terminated six (6) months prior to his representation of Dunlap;

(3) He had no contact with Witness A once the representation ended; and

(4) The government had not objected to Albregts appointment.

After determining not to withdraw, Albregts visited Dunlap to discuss the conflict issue and to determine whether Dunlap wanted him to remain as counsel.  Albregts explained the conflict to Dunlap.  Dunlap indicated his desire that Albregts remain his counsel and executed a conflict waiver.

Now, Albregts contends that he should not be disqualified because Witness A has no interest in the case.  He also contends that he should not be disqualified because he never made an appearance in a "court of law on behalf of Witness A" or "took an adverse position to Dunlap" during his representation of Witness A.  Albregts further contends that during the course of his representation of Witness A he did not obtain any confidential information that would hinder his ability to cross-examine Witness A.  Finally, Albregts suggests that, even if there is an irreconcilable conflict, the court could circumvent the issue by appointing separate counsel for the sole purpose of cross-examining Witness A.

**2. The Disqualification Hearing**

On May 12, 2009, the court conducted a hearing to establish an appropriate procedure for moving forward with this motion.  As a result of that hearing, the court appointed Douglass Mitchell as independent conflict counsel to Dunlap.  The purpose of the appointment was to ensure that Dunlap was fully informed regarding the potential conflict and potential repercussions of waiver.  Stanley Hunterton was appointed independent conflict counsel to Witness A for the same purposes.  The conflict hearing was scheduled for June 4, 2009.  The court anticipated that significant information would be shared with both Dunlap's and Witness A's conflict counsel prior to the June 4 hearing.  Unfortunately, the full extent of the information was not adequately disclosed to counsel for the affected parties and the hearing was continued to June 25, 2009.

At the hearing, the Court first inquired of conflict counsel whether they had the opportunity to meet with their respective clients regarding the conflict.  The Court also inquired of counsel whether they needed to put any evidence on the record.  Satisfied that conflict counsel had adequate opportunity to address the issues with their respective clients, the Court set forth some preliminary requirements to protect the identity of Witness A.  Specifically, the parties were instructed to refer to the government witness as Witness A, ascribing no gender or any other indication of identity.  These preliminary matters were conducted outside the presence of the defendant.

Once the preliminary requirements were in place, Dunlap was escorted into the courtroom.  The Court requested that the Government briefly outline the issue.  The Government provided a broad overview of the central issue – whether Albregts should be disqualified because he represented Witness A during the grand jury investigation of Defendant Dunlap.  The Government disclosed that Witness A provided information regarding the RICO charge and the homicide charges, the latter of which qualifies Dunlap for a potential capital sentence.

After the Government's broad overview, the Court requested that Dunlap's conflict counsel, Douglass Mitchell, address the issue.  The Court specifically requested an indication of the scope and range of discussions counsel had with Dunlap regarding the alleged conflict.

1  Mitchell gave a detailed accounting of his interactions with Dunlap.  Without revealing the

2  content of the discussion, Mitchell indicated that Dunlap demonstrated an understanding of the

3  issue, including the duties of loyalty owed by Albregts to the affected parties.  Mitchell

4  represented that Dunlap exhibited a specific understanding of how the issues impact him, his

5  case, and the propriety of continuing with Albregts as his counsel.  Mitchell also represented that

6  Dunlap expressed a great deal of confidence in Albregts and indicated that a strong, healthy

7  attorney-client relationship had been established.  Based on his dealings with Dunlap, Mitchell

8  expressed his belief that any waiver of the conflict was knowing, intelligent, and voluntary.

9       Satisfied with the general background, the Court requested that Mitchell describe the

10  general nature of his conversations with Dunlap.  Mitchell stated that he explained to Dunlap that

11  the most significant issues he may face are the lack of knowledge or certainty regarding what

12  Albregts knows regarding Witness A and whether Albregts will use all the information available

13  to him in cross-examining Witness A.  Mitchell also explained that Albregts would be in the

14  unenviable position of determining whether to potentially use information acquired while

15  representing Witness A against his former client for the benefit of a different client.  Mitchell

16  explained that, in his view, Dunlap had carefully weighed all of the information and determined

17  to waive the conflict and move forward with Albregts.  Mitchell agreed with the Government

18  that, if convicted, the conflict would be a potential issue during sentencing.

19       After Mitchell's presentation, the court addressed Albregts directly.  The court requested

20  the same general report regarding Albregt's conveyance of the conflict issue to Dunlap prior to

21  the filing of this motion.  Conceding that it may not have been with the same thoroughness as

22  Mitchell, Albregts did discuss the same general themes with Dunlap.  Albregts also disclosed that

23  he had contacted Witness A to schedule a meeting when he first realized the potential conflict.

24  The meeting did not take place.  Albregts has not had any discussions regarding the conflict since

25  the motion to disqualify was filed.

26       After Albregts presentation, the Court addressed Defendant Dunlap directly.  Dunlap

27  confirmed the scope and range of his discussions with Mitchell and Albregts.  He expressed no

28  additional concerns based on the in-court presentations.  The Court then provided Dunlap with a

copy of his written conflict waiver.  Dunlap acknowledged his signature and explained his

understanding of the conflict.  Dunlap acknowledged the Court's authority to appoint a conflict

free attorney regardless of the waiver.  Dunlap expressed his desire to continue with Albregts and

represented that he had not been forced to sign the consent, had not been offered or promised

anything in exchange for his signature, was healthy and not on any medication when he signed

the waiver, and had no access to any drugs or alcohol prior to signing the waiver.  Dunlap also

stated that he had no discussions with learned counsel regarding Albregts' conflict.

After canvassing Dunlap, the Court invited Stanley Hunterton, conflict counsel for

Witness A, to set forth the general parameters of his discussions with Witness A.  At the outset,

Hunterton established that Witness A would not be waiving any conflicts with Abregts.

Hunterton explained that his meetings with Witness A were not time intensive as, in his view,

this represents a simple, clear-cut issue.  Hunterton affirmed Witness A's position that under no

circumstances would Witness A consider waiving the conflict.  The court then excused Dunlap

After Dunlap left, Witness A was escorted into the courtroom.  The Court addressed

Witness A and explained the purpose for the hearing.  The Court confirmed Witness A's

discussion with Hunterton.  The Court inquired as to whether Witness A would be willing to

waive any conflict.  The answer was an unequivocal "no."  Witness A was dismissed.  Dunlap

was escorted back into the courtroom and informed that Witness A would not waive the conflict.

Against this factual backdrop, the Court invited argument from counsel.  The

Government argued that, under the applicable rules and law, Albregts has an actual conflict that

requires disqualification.  The Government also asserted that, at a minimum, the facts show there

is a potential conflict requiring that the Court intervene and reject Dunlap's waiver.  Finally, the

Government noted the practical result of permitting Albregts to continue as Dunlap's counsel –

notably the potential for reversal if a conviction is obtained with conflicted counsel still on the

case.  The Government conceded that it did not believe the conflict should be imputed to learned

counsel because there never was an attorney-client relationship established between Witness A

and learned counsel.  Additionally, learned counsel was not associated with the case or Albregts

during the course of his representation of Witness A.

1    Next, Albregts addressed the court.  He argued that the court needs to balance Dunlap's

2    right to an attorney of his choice and to an attorney with whom he has developed an attorney-

3    client relationship against the conflict.  According to Albregts, this balance comes down squarely

4    in favor of permitting the case to move forward with him serving as Dunlap's counsel.  Learned

5    counsel added that in a potential capital case such as this the relationship between the defendant

6    and counsel is paramount.  Matthewman argued that the court could use preventative measures,

7    such as shielding Albregts from the cross-examination of Witness A, as opposed to disqualifying

8    him altogether.

9    Finally, Witness A's conflict counsel addressed the Court.  He stressed Witness A's view

10   that the actual passage of privileged information is not a prerequisite to a conflict.  Further, he

11   argued that, contrary to Albregts assertion, the Court need not employ a balancing test in

12   reaching a decision.  He maintains that Witness A's decision not to sign the waiver conclusively

13   resolves the issue and requires disqualification.

14                                              **DISCUSSION**

15   **1. Rules of Professional Conduct**

16   Contrary to Albregts' assertion, the circumstances here implicate multiple Rules of

17   Professional Conduct.  For example, under Nevada Rule of Professional Conduct (NRPC) 1.6(a),

18   "[a] lawyer shall not reveal information relating to the representation of a client unless the client

19   gives informed consent."[2]  It cannot be disputed that a vigorous cross-examination in this

20   instance will necessarily touch upon information "relating" to Albregts representation of Witness

21   A.  If Witness A's testimony at trial is inconsistent with the testimony before the grand jury

22   Albregts will be forced to choose which client to serve.  Does he attack the credibility and

23   truthfulness of Witness A's testimony, or does he limit cross-examination to protect Witness A?

24   Either way he chooses he cannot avoid the conflict.  That Albregts doesn't remember whether

25   Witness A gave him confidential information simply underscores the conflict.  This situation

26   calls for a waiver under Rule 1.6(a), a waiver which Witness A has emphatically refused to give.

27

28       [2]   The Local Rules require attorneys to act in accordance with the Model Rule of Professional
Conduct as adopted and amended by the Supreme Court of Nevada.  Local Rule IA 10-7(a).

1    These facts also implicate NRPC 1.7(a) which provides, "[e]xcept as provided in

2    paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent

3    conflict of interest."  "A concurrent conflict of interest exists if ... [t]here is a significant risk that

4    the representation of one or more clients will be materially limited by the lawyer's responsibility

5    to another client, a former client or a third person or a personal interest of the lawyer.  NRPC

6    1.7(a)(2) (emphasis added).  A lawyer may continue with a concurrent conflict of interest if

7    certain criteria are satisfied including that "[e]ach affected client gives informed consent,

8    confirmed in writing."  NRPC 1.7(b)(4).  It cannot credibly be contended that there is not a

9    significant risk of material limitation if a lawyer cross-examines his former client, whom he

10    represented at the grand jury phase of an investigation, regarding testimony given before the

11    grand jury that indicted his current client.

12    Finally, Albregts concedes that this scenario implicates NRPC 1.9 but contends that

13    Dunlap's interests are not "materially adverse" to Witness A.[3]  The Court disagrees.  Albregts

14    represented Witness A during the grand jury investigation of this case.  The Government

15    represents that Witness A is an unindicted co-conspirator whose status depends upon truthful

16    testimony before the grand jury and during trial.  Witness A will be called upon to testify in

17    support of the Government's case against Dunlap.  Witness A and Dunlap's interests could not

18    be more diametrically opposed.  Once Witness A has testified, Albregts will have an obligation

19    to challenge the credibility and truthfulness of his former client and his former client's testimony.

20    Testimony that he advised be given truthfully.  Albregts will also be in a position to challenge

21    any leniency granted to Witness A in exchange for cooperation – cooperation he advised and

22

23    ───────────────

24    [3]  NRPC 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not
thereafter represent another person in the same or substantially related matter in which that person's interests

25    are materially adverse to the interests of the former client unless the former client gives informed consent,
confirmed in writing."  There is no question that Albregts former representation occurred, at a minimum, in
a substantially related matter. "Substantial relationship to the prior representation ... turns not only on factual

26    identity, but may be presumed where there is 'a reasonable probability that confidences were disclosed which
could be used against the client in a later, adverse representation.'"  *United States v. Baker*, 10 F.3d 1374,

27    1399 (9th Cir. 1993) (citing *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980), *overruled on other ground
by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000)).  Based on the record before the Court, there is
a reasonable probability that confidences were disclosed by Witness A to Albregts that could be used against

28    Witness A in this instance.

- 8 -

1   encouraged.  Albregts choice in this matter significantly impacts the interests of both Witness A

2   and Dunlap.

3          Under each of aforementioned Rules of Professional Conduct, Albregts representation

4   may continue if both Dunlap and Witness A give informed consent, confirmed in writing.  In

5   order to determine whether Dunlap and Witness A were willing to waive the conflict, the Court

6   appointed each separate counsel for this conflict issue.  Conflict counsel were given all necessary

7   information to advise their respective clients regarding the potential risks of Albregts continued

8   representation of Dunlap.  During the hearing on this matter, the Court inquired regarding the

9   scope and detail of the conflict discussion, including specific discussions regarding the nature

10  and risks presented.  Being satisfied that each affected party was adequately and fully informed

11  regarding the potential ramifications of waiver, the Court inquired of each party separately as to

12  whether they were willing to waive any conflicts arising out of Albregts continued representation

13  of Dunlap.  Dunlap responded emphatically that he was willing to waive the conflict and wished

14  to continue with Albregts as his counsel.  Witness A was equally emphatic in the refusal to waive

15  any conflict for purposes of Albregts' continued representation of Dunlap.  The Court agrees

16  with the Government and with conflict counsel to Witness A that Witness A's refusal to waive

17  the conflict under NRPC 1.6, 1.7, and 1.9 is conclusive on the issue and Albregts must be

18  disqualified on this basis alone.

19  **2.  The Sixth Amendment**

20         Even assuming Witness A's waiver is not necessary, given the nature and extent of the

21  conflict in this case the Court is comfortable rejecting Dunlap's waiver.  Such waivers are not

22  absolute. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

23  enjoy the right ... to have Assistance of Counsel for his defence."  U.S. CONST. AMEND. VI.  It

24  also includes "a correlative right to representation that is free from conflicts of interest."  *Wood v.*

25  *Georgia*, 450 U.S. 261, 271 (1981).  "Even where an actual conflict exists," a defendant "may

26  waive this conflict ... and elect to have the attorney continue representation, so long as the waiver

27  is knowing, intelligent, and voluntary."  *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir.

28  1994); *see also Brady v. United States*, 397 U.S. 742, 748 (1978) ("[W]aivers of constitutional

1  rights not only must be voluntary but must be knowing, intelligent acts done with sufficient

2  awareness of the relevant circumstances and likely consequences.").

3          The Court bears the "serious and weighty responsibility ... of determining whether there is

4  an intelligent and competent waiver by the accused."  and "must investigate as long and as

5  thoroughly as the circumstances of the case ... demand" before accepting waiver.  *Schneckloth v.*

6  *Bustamonte*, 412 U.S. 218, 244 n. 32 (1973) (citation omitted).  Although there are no clearly

7  established guidelines for an adequate conflict-waiver colloquy, at a minimum the defendant

8  must be "sufficiently informed of the consequences of his choice" in order for a waiver to be

9  knowing and intelligent.  *See Lockhart v. Terhune*, 250 F.3d 1223, 1232 (9th Cir. 2001) (citation

10 omitted).  A defendant is not required to predict particular dilemmas but is required to be aware

11 of all the risks that are likely to develop.  *Id.*  The choice to waive the Sixth Amendment right to

12 conflict-free counsel must be made with eyes open.  *Cf. United States v. Farhad*, 190 F.3d 1097,

13 1099 (9th Cir. 1999).  Consequently, although a criminal defendant generally has a presumptive

14 right to counsel of his choice, "that presumption may be overcome not only by a demonstration

15 of actual conflict but by a showing of a serious potential for conflict." *See Wheat v. United*

16 *States*, 486 U.S. 153, 164 (1988).

17         It must be noted that Dunlap is an indigent defendant who has been appointed counsel.

18 An indigent defendant does not have a constitutional right to be represented by counsel of choice.

19 *See Gonzales v. Knowles*, 515 F.3d 1006, 1013 (9th Cir. 2008) (citing *Caplin & Drysdale,*

20 *Chartered v. United States*, 491 U.S. 617, 624 (1989)).  Even assuming the presumption in favor

21 of Dunlap's right to counsel because "[t]he likelihood and dimensions of nascent conflicts of

22 interests are notoriously hard to predict," a court is afforded "substantial latitude" to determine

23 whether a conflict merits disqualification.  486 U.S. at 162-63.  Disqualification is appropriate,

24 despite the existence of a conflict waiver, not only where there is an actual conflict demonstrated

25 before trial "but in the more common cases where a potential for conflict exists which or may not

26 burgeon into an actual conflict as the trial progresses."  486 U.S. at 163.  "[C]ourts have an

27 independent interest in ensuring that criminal trials are conducted within the ethical standards of

28 the profession and that legal proceedings appear fair to all who observe them."  486 U.S. at 160.

- 10 -

1    Here, the conflict of interest is clear.  The Government has identified Witness A as a key

2    witness in this prosecution.  Attorney Albregts represented Witness A during the grand jury

3    phase of this case.  Albregts fostered the attorney-client relationship during multiple meetings

4    with Witness A where he discussed Witness A's status in the investigation, grand jury procedure,

5    alternatives to cooperating with the government, testimony, and testifying before the grand jury.

6    Albregts was also present with Witness A during discussions with the Government.  Prior to

7    Witness A's grand jury testimony, Albregts discussed the process, testimony, options, and

8    importance of Witness A's cooperation with the government.  Albregts was also present with

9    Witness A during discussions with the Government. Prior to Witness A's grand jury testimony,

10   Albregts discussed the process, testimony, options, and importance of Witness A's cooperation

11   with the Government.  Witness A testified before the grand jury which, subsequently, returned

12   the Indictment in this case.  Witness A allegedly testified regarding the RICO charge and the

13   murder allegations to the grand jury.

14       The potential for conflict here presents an insurmountable division that the Court cannot

15   minimize or overlook.  When Witness A is called to testify at trial, Albregts will be in the

16   precarious position of conducting or assisting in the cross-examination of his former client.  If

17   Albregts participates in the cross-examination, he will risk violating his ethical obligations to

18   Witness A.  If Albregts foregoes the cross-examination, Dunlap may be deprived of his Sixth

19   Amendment right to the effective assistance of counsel.  This division of loyalties will be

20   particularly pronounced when, after Witness A testifies on direct examination, Dunlap will be

21   entitled to any relevant statement made by Witness A before the grand jury.  *See* FED. R. CRIM. P.

22   26.2 ("After a witness other than the defendant has testified on direct examination, the court, on

23   motion of a party who did not call the witness, must order an attorney for the government or the

24   defendant and the defendant's attorney to produce, for the examination and use of the moving

25   party, any statement of the witness that is in their possession and that relates to the subject matter

26   of the witness's testimony ... As used in this rule, a witness's "statement" means ... the witness's

27   statement to a grand jury, however taken or recorded, or a transcription of such a statement.").

28   Once Witness A testifies, Albregts will be obligated to attack the credibility and truthfulness of

1    Witness A's grand jury testimony.  Testimony he advised Witness A to give truthfully.

2    Testimony given after Albregts advised Witness of the importance of cooperation with the

3    Government.  Testimony given after Albregts advised Witness A of the grand jury procedures

4    and the alternatives to cooperation with the Government.  The potential for conflict in this case is

5    too great and necessitates Albregts disqualification.[4]

6                                            **CONCLUSION**

7            There are no winners here.  Dan Albregts appears before this Court on a regular basis and

8    has earned a reputation as a talented, ethical attorney. However, the facts and circumstances

9    before the Court present a clear case for disqualification.  The Court notes that the Government

10   does not seek disqualification of learned counsel.  Accordingly, this disqualification is as to

11   Albregts only.

12                                              **ORDER**

13          Based on the foregoing, and good cause appearing therefore,

14          IT IS HEREBY ORDERED that the Government's Motion For the Appointment of a

15   Conflicts Attorney for Defendant Reginald Dunlap (#139) is **GRANTED**.

16          DATED this  6th  day of July, 2010.

17

18          _____
                ROBERT J. JOHNSTON
19              United States Magistrate Judge

20

21

22

23

24

25

26          [4]  Albregts proposes an alternative arrangement wherein he would agree not to participate, in any
27   way, in the cross examination of Witness A which would, instead, be performed by Learned Counsel.
     Despite representing that this is a common occurrence, Albregts provides no authority for the proposal.
28   Moreover, given the nature of the charges and potential penalties, the Court is not convinced that
     constructing a conflict wall between Albregts and Learned Counsel is appropriate.

                                                 - 12 -